UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Squirrels Research Labs LLC, *et al.*[1] | ) | Case No. 21- 61491 |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Judge Russ Kendig |

THE MIDWEST DATA COMPANY LLC'S
PLAN OF REORGANIZATION DATED FEBRUARY 21, 2022

This Plan of Reorganization dated February 21, 2022 (the "Plan") is being filed by The Midwest Data Company LLC, one of the above-captioned debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors") under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). While the case of this Debtor is being jointly administered with affiliate Squirrels Research Labs LLC ("SQRL"), this Plan is proposed by and applies to Debtor, The Midwest Data Company LLC ("MWDC") alone, and it is contemplated that SQRL will file its own plan of liquidation.

Subject to the restrictions set for in section 1193 of the Bankruptcy Code and any applicable Federal Rules of Bankruptcy Procedure, the Debtor expressly reserves the right to alter, amend, or modify the Plan, one or more times before its substantial consummation.

# Article 1: Background of the Case

## 1.01 Description and History of the Debtor's Business

MWDC is an Ohio limited liability company headquartered in North Canton, Ohio. MWDC provides hosting services for cryptocurrency mining machines to customers, some of whom purchased cryptocurrency mining machines from SQRL. Prior to the Petition Date, MWDC provided these hosting services from locations leased by SQRL at 8050 Freedom Ave., North Canton, OH and 7579 Freedom Ave., NW, North Canton, OH. Since the Petition Date, MWDC has continued to provide these hosting services from these locations. As the Lease Agreement for 8050 Freedom Avenue with One Haines Company was assumed and assigned to the purchaser pursuant to the Sale, MWDC is in the process of evaluating its options for a new location, including the possibility of entering into one or more lease agreements for the 8100 Cleveland Avenue and 7579 Freedom Ave. locations previously leased by SQRL.[2]

---

[1] The "Debtors" in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Squirrels Research Labs LLC (9310), case no. 21-61491 and The Midwest Data Company LLC (1213), case no. 21-61492.

[2] Capitalized terms not defined in the text are defined in Article 11 herein.

21-61492-tnap    Doc 44    FILED 02/21/22    ENTERED 02/21/22 21:24:17    Page 1 of 20

Debtor SQRL is also an Ohio limited liability company, headquartered in North Canton, Ohio. Prior to the Petition Date, SQRL created, manufactured, and repaired hardware, including DataCenter Accelerator Boards, used in cryptocurrency mining machines. SQRL's business operations were housed in two locations: 8050 Freedom Avenue, North Canton, Ohio 44720 pursuant to a lease with One Haines Company, LLC and 7579 Freedom Avenue, NW, North Canton, Ohio 44270 pursuant to a lease with One Skymax Company, LLC.

Prior to the Petition Date, SQRL also entered into a lease for space located at 8100 Cleveland Ave., North Canton, OH pursuant to a lease with GS8100 LLC. However, operations at this location never commenced due to delays with the power company.

On the Petition Date, David Stanfill owned or controlled 16.7% of the membership units in SQRL and 40% of the membership units in MWDC.

**1.02** **Events Leading to Chapter 11 Filing Overview of the Debtor's Financial Structure**

Prior to the Petition Date, MWDC's affiliate, SQRL executed and delivered to Avnet, Inc. ("Avnet"): (i) a promissory note in the original principal amount of $4,621,092.50 dated March 26, 2019 (the **"Initial Note"**) and (ii) a Security Agreement dated as of March 20, 2019 granting a lien in the collateral described therein (the **"Avnet Collateral"**) in favor of Avnet to secure payment of amounts invoiced by Avnet (the **"Security Agreement"**).

Debtor SQRL began the process of seeking counterparts for a recapitalization or sale of the company's assets in late 2020 on account of then-existing capital constraints arising from a global shortage of computer chips and other critical components required for the manufacturing of cryptocurrency mining equipment. As a result of the COVID-19 pandemic, the world-wide supply chain for, among other things, computer chips was severely disrupted, leading to lengthy delays in SQRL obtaining components required for its products. The foregoing supply chain disruptions have continued to date, thereby significantly detrimentally impacting SQRL's ability to manufacture cryptocurrency mining equipment.

SQRL's efforts in seeking additional capital or a sale of substantially all assets resulted in the execution and delivery of a Membership Unit Purchase Agreement with Fleur-de-Lis, LLC ("FDL") dated as of December 31, 2020, whereby FDL was to purchase 51% of the membership interests in SQRL from SQRL's treasury for $10 million on or before January 30, 2021. FDL thereafter breached the Membership Unit Purchase Agreement by failing to pay any of the $10 million purchase price on or before January 30, 2021. SQRL filed a complaint for damages and injunctive relief against FDL and others in the Stark County Court of Common Pleas on March 1, 2021 (the "FDL Action"). The FDL Action remains pending. SQRL has removed the FDL Action to the United States Bankruptcy Court for the Northern District of Ohio.

Also, during 4th quarter of 2020 and throughout the 1st quarter of 2021, SQRL negotiated numerous settlements with trade vendors and suppliers resulting in approximately $617,000 of trade debt to suppliers being settled and compromised for approximately $324,000, plus the release of certain consigned goods and delivery of components previously ordered. In addition, SQRL also negotiated a settlement of certain obligations with an equipment lessor resulting in a reduction of monthly costs from approximately $90,000 per month to

approximately $53,000 per month with corresponding extensions of the terms of said leases and increased balloon payments to be due at the ends of the lease terms.

Faced with severe liquidity constraints, SQRL raised capital from existing members and certain new members throughout the first and second quarters of 2021 in order to pay the obligations to vendors described in the preceding paragraph and the obligations to Avnet, as described below.

In early 2021, SQRL commenced negotiations with Avnet, who had historically been a major supplier of key components critical to SQRL's business. At that time, SQRL's outstanding indebtedness to Avnet under the Initial Note was approximately $8,191,000. SQRL and Avnet were able to reach a framework for the restructuring of SQRL's account with Avnet, the principal terms of which were: (i) a payment of $369,300 to Avnet on account of the then-existing balance due under the Initial Note on or before March 31, 2020, (ii) monthly payments thereafter pursuant to an amended and restated promissory note executed by SQRL and delivered to Avnet dated April 8, 2021 in the original principal amount of $7,864,779.76 (the "**Amended and Restated Note**"), which Amended and Restated Note remained secured by the lien granted by the Security Agreement, and (iii) a purchase by SQRL and shipment by Avnet of 3,676 VU35P and VU33P FPGA chips for $2,630,700 immediately thereafter. Avnet did not thereafter deliver the full amount of SQRL's order of the VU35P and VU33P FPGA chips, and instead only delivered 3,611 VU35P chips. SQRL nonetheless made the initial monthly payment to Avnet and monthly payments under the Amended and Restated Note through the payment due for June, but thereafter defaulted in making monthly payments to Avnet. Avnet declared SQRL in default under the terms of the Amended and Restated Note and the Security Agreement on August 20, 2021, thereby freezing SQRL's use of cash collateral and ability to pay operating expenses.

As a result, SQRL was forced to freeze its already paused operations and terminated the employment of all employees effective as of August 27, 2021. As a result of the freeze, SQRL was unable to make its final payroll to employees, including the 401(k) employee and employer contributions. MWDC continues to provide hosting services to its customers and has paid certain operating expense obligations of SQRL from and after SQRL's default under the Amended and Restated Note and Security Agreement. For instance, MWDC used its funds to pay the final payroll of SQRL's employees, not including the 401(k) employee and employer contributions.

In addition, beginning in the second quarter of 2021, an existing customer/client began initiating orders with third parties for cryptocurrency mining machines to be manufactured by SQRL which orders were made outside of the standard procedures for initiating orders. Due to the supply chain disruptions described above, SQRL was unable to obtain sufficient component parts to satisfy the foregoing orders in a timely manner, and, upon information and belief, the unauthorized party or parties initiating those orders did not advise any of the ordering parties that SQRL would be unable to meet the production schedule promised. The foregoing has led to threats of litigation against, among others, MWDC and SQRL.

On the night of July 15, 2021, an area of the SQRL main warehouse, located at 8050 Freedom, that contained more than 1000 operating FPGAs experienced a fire. The fire originated on racks of equipment containing operating liquid cooled JungleCat modules and some direct

impact occurred in that area. As the fire grew, it caused liquid cooling lines that were under substantial pressure to burst, which led to water spray, steam, and soot expanding through the entire warehouse area.

This affected all operating equipment in the room, as well as permeable SQRL inventory and non-operating inventory in the area. This liquid and steam self-extinguished the fire, however heavy smoke and soot filled the area as well as the open liquid cooling reservoir for the operating equipment. The loss of cooling fluid also caused the failure of at least one cooling pump from running dry. The emergency responders cut power to half of the SQRL and MWDC building to manage the incident, and in doing so inadvertently shut off the external liquid cooling radiator fans associated with equipment on the far side of the building, encompassing more than 2000 additional operating units. The power outage also affected more than 1000 air cooled operating units in a different area of the building. The units that were operating on the other side of the building experienced an extreme overheat/boiling event that distorted and damaged cooling pipes and fittings and led to leaks and liquid damage in that area. As a result, all equipment in the 8050 Freedom facility experienced outages for extended periods of time.

In addition, the loss of power and subsequent equipment damage affected the main fiber link and internet router as well command and control servers that served both the 8050 and 7579 properties. This equipment was housed in a smaller room inside the warehouse with an open door. The loss of this equipment caused more than 3000 additional FPGAs in the 7579 building to lose network communication. The 7579 property internet connection was fed directly from 8050 by a peer-to-peer fiber link, and the 8050 command and control servers also operated that equipment.

In total, nearly all SQRL and MWDC hosted equipment was brought offline by the incident.

Following the incident, SQRL and MWDC's mutual insurance company, Cincinnati Insurance, coordinated the dispatch of a team from AREPA to provide cleanup and recovery services. From the period of the incident through late August 2021, AREPA teams fully disassembled all electronic equipment, FPGA modules heatsinks, cooling systems, power distribution equipment, and other items of technology affected by the fire, smoke, and soot. Due to the proprietary nature of the equipment and SQRL being the OEM, AREPA required the support of the SQRL repair, rework, production, testing, and support technicians to instruct them on handling, disassembly, cleaning, testing, reassembly, and inspection of the equipment. This prevented SQRL staff from performing their ordinary duties of building, installing, and maintaining other equipment. This loss of operations and services led to loss of sales in progress, as well as impacted significantly MWDC hosted customers.

Upon the assertion of default and freezing of cash collateral in late August, 2021, SQRL staff was no longer able to assist AREPA. As a result, AREPA also left the premises prior to full recovery of the facilities or equipment. This also delayed SQRL and MWDC in finalizing a claim for final causality loss and business interruption as the business remained inactive.

The Debtors believe they have a combined coverage limit, for casualty and business interruption related to the above-described events, in excess of $10,000,000.00. Insurance Claims are in process for this business interruption and physical damage but remain unresolved as of the date of this Plan.

Shortly after the July 15, 2021 fire, an existing customer/client asserted a direct claim against the Debtors' insurance carrier for alleged damages and for loss of cryptocurrency mining revenues and has subsequently threatened litigation against, among others, MWDC.

As of November 22, 2021, SQRL remained obligated to Avnet in the principal amount of $7,864,779.76 plus accrued and accruing interest, fees, costs, and other charges (including attorneys' fees and costs) (the "**Avnet Claim**").

Prior to the Petition Date, the Debtors received an offer to purchase certain of their assets, as set forth in the Asset Purchase Agreement dated as of November 23, 2021 from Instantiation LLC. On the same date, Avnet, SQRL, MWDC, and Instantiation, LLC entered into an Account Settlement and Sale Support Agreement whereby those parties agreed, as of the Effective Date thereof, that in order to support the Chapter 11 process, Instantiation LLC will provide debtor in possession financing to MWDC in the original principal amount of $350,000 as described in the DIP Loan documents evidencing and memorializing same necessary to fund these Chapter 11 cases and the related sale process, and seek to purchase the Debtors' assets, including the Avnet Collateral. In addition, Avnet agreed to support the Sale, not object to the debtor-in-possession financing to be provided by Instantiation, and SQRL and Avnet agreed to a resolution of the amount and treatment of the Avnet Claim, such that the Avnet Claim is reduced to the amount $5,751,000 (the "**Reduced Avnet Claim**"). In addition, SQRL agreed therein that the value of the Avnet Collateral is not less than $3,000,000.00 and pursuant to section 506 of the Bankruptcy Code, the Reduced Avnet Claim is a secured claim in the amount of not less than $3,000,000.00 (the "Avnet Secured Claim") and an unsecured claim for the remainder.

## 1.03 Overview of Events During Bankruptcy Case

Immediately upon the filing of this case, the Debtors filed a motion for joint administration, a motion to authorize MWDC to obtain debtor in possession financing from Instantiation and a motion to establish bid and sale procedures for the sale of assets to Instantiation. The Court heard the motions on an expedited basis on December 1, 2021. Due and appropriate notice of the motions and the expedited hearing date were provided.

**Joint Administration**

The Court entered an order authorizing the joint administration of these cases for procedural purposes only on December 1, 2021.

**DIP Financing**

The Court entered an Interim Order: (I) Authorizing Secured Postpetition Financing on a Superpriority Bases Pursuant To Section 364 of the Bankruptcy Code; (II) Modifying the

Automatic Stay; and (III) Granting Related Relief on December 2, 2021 (the "Interim Order"). The Interim Order authorized MWDC to borrow a maximum of $350,000 on secured basis, with up to $279,000 in the Interim Period, provided for a Carve Out for professional fees, including the Subchapter V Trustee, Debtors' counsel and other estate professionals. A Final Order was entered on December 9, 2021 authorizing the post-petition borrowing up to $350,000 and granting a superpriority claim for Advances (the "Superpriority Claims") and liens on MWDC Assets (the "DIP Liens") subject to a carveout for, *inter alia,* (1) the payment of fees and expenses of professionals retained by Debtors up to an aggregate amount not to exceed $150,000 and (2) fees payable to the Subchapter V Trustee up to an aggregate amount not to exceed $50,000. Advances to date total $250,000.

**Sale of Assets**

On December 1, 2021, the Court entered the Bidding Procedures Order establishing procedures for the auction and sale for certain assets of SQRL and MWDC, as defined therein, designating Instantiation as the stalking horse bidder, and granting related relief [Docket #40]. No competing bids were submitted before the bid deadline set in the Bidding Procedures Order and thus, no auction was held. The Court held a hearing on the Debtors' motion to approve the Sale on January 11, 2022 and entered an order authorizing the Sale on January 18, 2022. The Sale closed on January 27, 2022. MWDC received $10,000 in proceeds from the Sale. Avnet has received full payment of the Avnet Secured Claim.

**Bar Date**

On December 21, 2021, the Court entered an Order Establishing General and Government Claims Bar Dates. The General Bar Date in this case is February 20, 2022 and the Government bar Date is May 22, 2022.

**1.04    Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity-interest holders would receive in a chapter 7 liquidation. In addition to the proceeds from the Sale, the Debtor's assets excluded from the Sale are all subject to the DIP Lien, except for Avoidance Actions. Those remaining assets include the following:

CHAPTER V AVOIDANCE ACTIONS

Debtor has reviewed its records and bank statements to determine whether there were any transfers within the past four years that would give rise to an Avoidance Action under Chapter 5 of the Bankruptcy Code. Debtor has not identified any potential Avoidance Actions. Thus, the Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

OTHER CAUSES OF ACTION, AND OPEN RECEIVABLES

Prior to the Petition Date, MWDC provided hosting services to various customers for a fee. Some customers have not paid the full amount of the fee for hosting services provided by MWDC.

INSURANCE CLAIMS

As discussed more fully in Article 1.02 of the Plan, the Debtor and MWDC suffered a significant interruption in their business activities. Debtors have a claim for physical damage and business interruption against their insurer, Cincinnati Insurance. Though the Insurance Claims have not yet been liquidated, the Debtor believes the Insurance Claims will result in a recovery for the estate.

HOSTING AGREEMENTS

Debtor continues to provide hosting services to customers pursuant to Hosting Agreements and receives payments from customers for these hosting services.

Debtor's assets, with the exception of any Avoidance Actions arising under Chapter V of the Bankruptcy Code, are Collateral for Instantiation subject to the DIP Lien. The Debtor believes the recovery on the Insurance Claim will be sufficient to satisfy the Superpriority Claim of Instantiation and the DIP Lien, but in the event the recovery on the Insurance Claim is insufficient, the DIP Lien would extend to all assets of the Debtor up to the amount then outstanding on the DIP Loan.

Furthermore, the general unsecured claims in this case are less than $20,000. There are only two creditors in this case. One asserted in Claim No. 1 by the IRS is a general unsecured claim in the amount of $100 and a priority claim in the amount set forth below in Article 4. The other is the scheduled claim of AEP Ohio in the amount of $17,089.09. The Debtor believes its projected disposable income from operations and liquidation of some or all of the assets listed above will be sufficient to pay the Administrative Expense Claims, Priority Tax Claims and all other Allowed Claims in full.

In the event, the Plan is not confirmed, this Case may be converted to a case under chapter 7 of the Bankruptcy Code and the Debtor's remaining assets liquidated. In the event of a liquidation, the Debtor does not believe the hosting agreements have value. Rather, their value comes from the Debtor's on-going provision of hosting services. In addition, the conversion to chapter 7 will add an additional layer of administrative expense that would have to be paid ahead of unsecured creditors. Thus, the Debtor believes the value of the Debtor's assets and the ability to maximize that value for distribution to creditors is greater in a reorganization than in a liquidation under chapter 7. A copy of the liquidation analysis required by 11 U.S.C. § 1190 is attached to the Plan as **Exhibit A**.

**1.05** **Ability to Make Future Plan Payments and Operate Without Further Reorganization**

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate the Debtor's business. Projections that support the Debtors' ability to make all payments required by the Plan are attached to the Plan as **Exhibit B**. *See* 11 U.S.C. § 1190. **Nothing in the projections should be deemed or construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any claim on any grounds; or (c) a promise to pay any claim.**

The Debtor's financial projections show that the Debtor will have total projected disposable income (as defined by § 1191(d) of the Bankruptcy Code) for the period described in § 1191(c)(2) set forth on Exhibit B. Over the life of the Plan, or until such time as Allowed Claims are paid in full, the Reorganized Debtor will pay the projected disposable income as required by 1191(d) of the Bankruptcy Code, regardless of the Reorganized Debtor's actual disposable income.

The final Plan payment is expected to be paid on or before the Third Anniversary from the Effective Date of this Plan.

## Article 2: Plan Summary

This Plan proposes to pay creditors of the Debtor from the future cash flow of its business operations.

This Plan provides for:

1 class of priority claims;
1 class of non-priority unsecured claims; and
1 class of equity security holders.

Non-priority unsecured Creditors holding Allowed Claims are likely to receive distributions under the Plan equal to 100% of their Allowed Claim. This Plan provides for full payment of administrative expenses and priority claims. All creditors and equity security holders should refer to Articles 3 through 5 of this Plan for information regarding the precise treatment of their claim. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney if you have one. (If you do not have an attorney, you may wish to consult one.)**

## Article 3: Classification of Claims and Interests

| | | |
|---|---|---|
| **3.01** | **Class 1** | This class consists of all Allowed Claims entitled to priority under § 507(a) of the Bankruptcy Code. The Debtors do not believe there are any claims in Class 1. |
| **3.02** | **Class 2** | This Class consists of all non-priority unsecured claims not otherwise classified and allowed under § 502 of the Bankruptcy Code. |

| | | |
|---|---|---|
| 3.03 | **Class 3** | This Class consists of the equity interests of the Debtor |

## Article 4: Treatment Of Administrative Expenses, Priority Tax Claims, And Quarterly And Court Fees

| | | |
|---|---|---|
| 4.01 | **Unclassified claims** | Under section § 1123(a)(1), allowed administrative expenses and Priority Tax Claims are not in classes. |
| 4.02 | **Administrative expenses** | If this Plan is consensually confirmed under § 1191 of the Bankruptcy Code, Administrative Expenses allowed under § 503 of the Bankruptcy Code, including the Superpriority Claim, will be paid in full on the later of Effective Date of this Plan or when such claim arises, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. If this Plan is not consensually confirmed under § 1191 of the Bankruptcy Code, Administrative Expenses allowed under § 503 of the Bankruptcy Code will be paid as follows consistent with section 1191(e) of the Bankruptcy Code: (1) Expenses arising in the ordinary course of business after the Petition Date shall be paid in full on the Effective Date, or according to the terms of the obligation, if later. All other administrative claims will be paid pro-rata, monthly, with other administrative claims and in the order of priority set forth in §§ 503 and 507 of the Bankruptcy Code. The Debtor estimates that it will owe its counsel at least $50,000 in legal fees as of the Effective Date, owe the Subchapter V Trustee $3,000 in fees as of the Effective Date, and owe to its accountant $5,000 in fees as of the Effective Date. |
| 4.03 | **Priority Tax Claims** | The Internal Revenue Service filed a priority tax claim as follows (the "<u>Tax Claims</u>"):<br><br>The IRS filed an amended proof of claim No. 1 on December 8, 2021 in the amount of $1,000, claiming priority in the amount of $900. (the "<u>IRS Priority Tax Claim</u>").<br><br>The Debtor disputes certain of the amounts of the Tax Claims, but for purposes of the budget of this Plan, are making the assumption that these are the amounts owed on the Tax Claims. The projected disposable income may increase or decrease to the extent the Tax Claims or other governmental priority claims are lower than the amounts stated in the respective proofs of claim. |

| | | |
|---|---|---|
| | | The priority portion of the Tax Claims will bear interest at 3% and will be paid pro rata to each agency in a monthly amount to account for pro rata distribution of any Allowed Tax Claim upon the earlier of 36 months from the Effective Date or within 5 years after the Petition Date and the unsecured portions of the Tax Claims will be treated as set forth in Class 2. |
| 4.04 | **Statutory fees** | All unpaid fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan will be paid on or before the Effective Date. |
| 4.05 | **Prospective quarterly fees** | As a Subchapter V debtor, the Debtor is not required to pay quarterly fees under 28 U.S.C. § 1930(a)(6) or (a)(7). If these are subsequently reimposed, they will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Bankruptcy Code. |

## Article 5:   Treatment Of Claims And Interests Under The Plan

The Reorganized Debtor reserves the right to pay any claim at any time in accordance with the terms of this Plan,(i.e., at the percentage distribution designated in the Plan including accrued and unpaid interest, if any) without prepayment penalty. Without violating the automatic stay, the Confirmation Order, or other provisions of the Bankruptcy Code, creditors holding Secured Claims or Priority Claims that will be paid in full hereunder may, in their discretion, send invoices containing payment amount and balances as set forth herein. The Classes, the treatment of each Class, and the voting rights of each Class are set forth below.

**5.01**   **Class 1 – Priority Claims – Unimpaired and Deemed to Accept**

This Class consists of all Allowed Priority Claims under § 507 of the Bankruptcy Code except those in Article 4 of the Plan. The Debtor believes there are no creditors in this class.

**Treatment**

Unless it agrees to a different treatment, any claimant holding an Allowed Claim in this Class shall be entitled to be paid in full on the Effective Date.

**5.02**   **Class 2 – General Unsecured Claims – Unimpaired and Deemed to Accept**

This Class consists of all unsecured Allowed Claims not otherwise classified or provided for in other provisions in this Plan. Only creditors holding Allowed Claims shall, as provided for in 11 U.S.C. §502(a), be entitled to receive a distribution according to the Treatment provided for in this Class. Subject to the provisions of § 502, untimely claims are disallowed, without the need for formal objection, unless allowed by court order.

**Treatment**

Allowed Claims in Class 2 will be paid from the Reorganized Debtor's Disposable Income, as defined in 11 U.S.C. § 1191(d), after and subject to the payment of Administrative Expenses and Priority Tax Claims provided for in Article 4 of this Plan, and payments to all other Classes above that are expressly provided for above. No interest shall accrue on any Claims in this Class. The Debtor expects to be able to pay the Allowed Class 2 Claims in full over the length of the Plan.

**5.03** **Class 3 – Equity Holders -- Unimpaired and not entitled to vote on this Pl an**

This Class consists of the Equity Interests of the Debtor.

**Treatment**

Confirmation of this Plan shall cause all membership units issued by Debtor, The Midwest Data Company LLC, to be revested in and retained by those holding an interest in the Debtor The Midwest Data Company LLC as of the Petition Date and shall be subject to and based upon the terms and conditions as they existed on the Petition Date including under any Articles of Incorporation, By-Laws, and other duly executed corporate documents.

# Article 6:    Allowance and Disallowance of Claims

**6.01** **Disputed claim**

A disputed claim is a claim that has not been allowed or disallowed and as to which either:

(i) A proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii) No proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

**6.02** **Delay of distribution on a disputed claim**

No distribution will be made on account of a disputed claim unless and until it is allowed.

**6.03** **Settlement of disputed claims**

The Reorganized Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

# Article 7: Provisions for Executory Contracts and Unexpired Leases

**7.01** <u>**The Debtor assumes the following executory contracts and unexpired leases as of the Effective Date of the Plan**</u>**:**

On the Petition Date, Debtor MWDC was party to hosting agreements with:

Megan Duelks
Robert Oxsen
Marco Mendoza
Spencer Gabriel Singh
Jose A Rubio
Richard Hall
Jason Palmer
Yannick Vergult
Jose Nunez
Aditya Chauhan
Arran Gracie
Andrew Wolf
James Soldi
Aaron Strating
Henrik Gustafsson
Fabian Delmotte
Artem Pylypchuk
Lance Colton
Richard Ramazinski
Jonathan Hulecki
Todd Dallimore
Barry Gluntz
Matthew Peterson
Matthew Peterson
Michael Erceg

Debtor hereby assumes all of the hosting agreements on this list that are capable of assumption.

On the Petition Date, Debtor MWDC was party to the Account Settlement and Sale Support Agreement. MWDC intends to assume this agreement.

On the Petition Date, Debtor MWDC was a party to an Insurance Contract with Cincinnati Insurance. MWDC does not believe the Insurance Contract is an executory contract as that phrase is used in section 365 of the Bankruptcy Code. In an abundance of caution, however,

and in the event the Insurance Contract is determined to be executory in nature, the Debtor hereby assumes the Insurance Contract.

**7.02** **All Other Executory Contracts and Unexpired Leases**

Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, either before the effective date of this Plan, or that are specifically identified in section 7.01 as being assumed, or that are the subject of a pending motion to assume, and if applicable assign, the Debtors will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date. A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 45 days after the Effective Date.

## Article 8: Means for Implementation of the Plan

Except as otherwise provided herein: (1) on the Effective Date, MWDC will, as part of the creation of the Reorganized Debtor, cease to exist as a separate legal entity; and (2) on the Effective Date, all property of the Estate of the Debtor, and any property acquired by a Debtor will vest in the Reorganized Debtor free and clear of all claims, liens, charges, other encumbrances, Interests and other interests, other than the liens, claims and encumbrances specifically provided for in the Plan. On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

The Plan will be implemented and funded through the recovery on the Insurance Claim, proceeds of other causes of action, and future business operations of the Reorganized Debtor. The Debtor is presently evaluating its options for leased space from which to conduct its business, including space previously leased by SQRL at 7579 Freedom Ave., North Canton, OH and 8100 Cleveland Ave., North Canton, OH. In addition, MWDC is working to develop additional hosting business.

As a part of its reorganization, the Reorganized Debtor does not contemplate the sale of any assets except that assets may be sold to the extent that it is later determined they are no longer of value to the Reorganized Debtor's business operation or their useful life for the Reorganized Debtor has expired.

The Reorganized Debtor may however seek to sell its operations as a going concern. So long as such a sale produces the same amount of the Projected Disposable Income due under this Plan on or before the final date of this Plan, no court approval of the sale or modification of this Plan shall be necessary. The Reorganized Debtor, or Trustee, if applicable, may prepay any amount due or any Allowed Claim in whole or in part without penalty at any time after the Effective Date. Prepayments shall be applied first to interest actually due on the payment date and then to principal.

According to 11 U.S.C. § 1129(a)(5), it is disclosed that the current officers and directors of the Debtor will continue to serve in their respective capacities for the Reorganized Debtor after Confirmation of this Plan. Each Director and Officer shall serve under applicable non-bankruptcy law and the Reorganized Debtor's Articles of incorporation and bylaws, as each of the same may be amended from time to time. At this time, the addition of future officers and directors is not contemplated. No insiders will receive wages or salary from the Reorganized Debtor at any time before the payments due under the Plan are complete.

The Debtor expects to have sufficient cash on hand to make the payments required on the Effective Date.

## Article 9: Default

If the Reorganized Debtor shall fail to pay any amount due under this Plan when due, and if such failure is not remedied within 60 days of such date, the Subchapter V Trustee (or if the Subchapter V Trustee's services have been terminated under 11 U. S.C. §1183(c)(1), any party in interest) may move in the Bankruptcy Court (1) for the appointment of the Trustee to take control of the Reorganized Debtor and the Reorganized Debtor's assets; or (2) conversion to Chapter 7.

If any payment is due under this Plan and the Reorganized Debtor has pre-paid such amount, then payments on such amount shall not be deemed due under this Plan until the originally scheduled date for such payment has occurred, and any prepayment shall suspend the duty to make regular payments until such time as the total amount transferred in payment of such Allowed Claim is less than the total amount of the principal payments due on the specified payment date.

## Article 10: Vesting

Under 11 U.S.C. § 1141(b), on Confirmation of the Plan, all property of the estate will revest in the Reorganized Debtor, except as otherwise provided in the Plan or the Confirmation Order.

Under 11 U.S.C. § 1141(c), on Confirmation of the Plan, all property of the Debtor dealt with in the Plan, tangible and intangible, including, without limitation, licenses, furniture, fixtures, and equipment, will revert, free and clear of all Claims and Equitable Interests of the Debtor, except as otherwise provided in the Plan or the Confirmation Order.

## Article 11: General Provisions

### 11.01 Definitions and rules of construction

The definitions and rules of construction outlined in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan. Additional capitalized terms shall have the meanings as defined in the body of the Plan or as follows:

a. **Administrative Claimant**: Any person entitled to payment of an Administrative Expense.
b. **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under Section 503(b) of the Bankruptcy Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.
c. **Allowed Claim**: Except as otherwise specified in this Plan, any claim against the Debtor according to Section 502 of the Bankruptcy Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not file an objection, or (ii) is allowed by a Final Order.
d. **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.
e. **Allowed Secured Claim**: Except as otherwise specified in this Plan, Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Bankruptcy Code.
f. **Bankruptcy Court**: The United States Bankruptcy Court for the Northern District of Ohio.
g. **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.
h. **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).
i. **Class**: A category of holders of claims or interests which are substantially similar to the other Claims or interests in such class.
j. **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.
k. **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided, however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.
l. **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan under the provisions of chapter 11 of the Bankruptcy Code.

m.  **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.
n.  **Disposable Income**: Shall have that meaning ascribed to such term under § 1191(d) of the Bankruptcy Code.
o.  **Disputed Claim:** Any claim against the Debtor pursuant to Section 502 of the Bankruptcy Code that the Debtor has in any way objected to, challenged, or otherwise disputed.
p.  **Equity Interest**: An ownership interest in the Debtor.
q.  **Executory Contracts**: All unexpired leases and executory contracts as set forth in Section 365 of the Bankruptcy Code.
r.  **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified, or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.
s.  **Petition Date**: November 23, 2021, the date the chapter 11 petition for relief was filed.
t.  **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.
u.  **Reorganized Debtor**: The Debtor after the Effective Date.
v.  **Sale**: The acquisition of certain assets of Squirrels Research Labs LLC and The Midwest Data Company LLC by Instantiation LLC pursuant to the Sale Order.
w.  **Sale Order**: The Order: (I) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. § 105 and 363; and (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief entered by this Court on January 18, 2022.
x.  **Schedules**: Schedules and Statement of Financial Affairs, as may be amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.
y.  **Subchapter V Trustee**: Frederic Schwieg, the trustee appointed according to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the Confirmation Order.

## 11.02 Effective Date

The effective date of this Plan is the day is the first business day that is 14 days after the Confirmation Order becomes a Final Order. If, however, a stay of the Confirmation Order is in effect on that date, the effective date will be the day after the date on which the stay expires or is otherwise terminated. These periods are calculated as provided in Federal Rule of Bankruptcy Procedure 9006(a)(1).

## 11.03 Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**11.04**  **Binding effect**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**11.05**  **Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**11.06**  **Controlling effect**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Ohio govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**11.07**  **Retention of Jurisdiction**

The Court shall retain jurisdiction to the full extent necessary to administer this case after Plan Confirmation and to adjudicate any related adversary proceedings or contested matters, including those relating to the Plan, such as concerning the Plan's construction, implementation, or modification. Neither this provision nor anything in this Plan constitutes a limitation on or an expansion of the jurisdiction authorized by title 28 of the United States Code.

## Article 12:   DISCHARGE

If the Debtors' Plan is confirmed under § 1191(a), on the Effective Date of the Plan, the Debtors will be discharged from any debt that arose before Confirmation of this Plan to the extent specified in § 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtors will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in § 1141(d)(6).

If the Debtors' Plan is confirmed under § 1191(b), Confirmation of this Plan does not discharge any debt until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Bankruptcy Code. The Debtors will not be discharged from any debt: (i) on which the last payment is due after the first 3 years of the Plan, or as otherwise provided in § 1192; or (ii) excepted from discharge under § 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## Article 13:   REPORTING, PAYMENTS AND TRUSTEE OBLIGATIONS

Unless specified otherwise in the Plan, whether the Plan is confirmed under §1191(a) or (b), payments due under the Plan shall be made by the Reorganized Debtor. Payments to creditors in Class 2 shall be made at least Quarterly, and in the discretion of the Reorganized Debtor, may be made more frequently.

If the Plan is confirmed under § 1191 (b) the following provisions shall also apply:

**Quarterly Financial Reporting**. The Reorganized Debtor shall file with the Court no later than 21 days after the end of each quarter after the Effective Date, post-confirmation quarterly financial reports (the "Quarterly Reports") during the Plan term, showing the amount of Disposable Income subject to distribution in accordance with the Plan ("Quarterly Income"). The Quarterly Reports shall: (i) be generated by the Reorganized Debtor's management or an accounting or finance professional retained by the Reorganized Debtor; (ii) detail the Reorganized Debtor's actual Disposable Income for each calendar quarter (which shall be calculated using a cash basis method of accounting and reported in accordance with Generally Accepted Accounting Principles (GAAP)); and (iii) be certified by the Reorganized Debtor.

**Debtor's Remittance**. If a disbursement check remains unnegotiated for more than 120 days, it may be redistributed pro rata to other creditors, as provided for under the Plan, or may be placed with the Court's unclaimed funds register pursuant to 28 U.S.C. 2042, at the discretion of the Reorganized Debtor. In the event the Reorganized Debtor has insufficient funds to may any distribution under the Plan, plan payments may be adjusted during the life of the Plan without further order of the Court to account for any Plan Payment adjustments. Any disbursements made on account of an allowed claim are deemed authorized disbursements. The Reorganized Debtor will pursue the recovery of any disbursements made on account of a claim which is subsequently withdrawn or satisfied.

**Disbursement Reports**. The Reorganized Debtor shall file disbursement reports as prescribed by the Court and submit a copy of those reports to the United States Trustee for review, during the period in which the Trustee continues to make plan payments. Upon completion of all plan payments, the Reorganized Debtor should submit a notice of completion, so that the Trustee can prepare and submit the final report and final account of the administration of the estate to the United States Trustee for review pursuant to section 1183(b)(1).

**Notices**. The Reorganized Debtor may limit notice of any and all reports, document, pleading or other filing related to this case to those parties directly affected and to those interested parties which have filed a notice of appearance or proofs of claim, as necessary. The Reorganized Debtor shall be under no obligation to serve parties which are neither affected by any report, document, pleading or other filing or have made no appearance whatsoever before this Court.

**Payments and Distributions on Disputed Claims**. Except as otherwise provided in the Plan, no partial plan payments and no partial distributions will be made with respect to a Disputed Claim until the resolution by the Reorganized Debtor of such dispute by settlement or Final Order. For purposes of clarity, each class's claimants will not be entitled to a distribution until all claims within the applicable class are final. Unless otherwise agreed to by the Reorganized Debtor or as otherwise specifically provided in the Plan, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a distribution until such dispute is resolved by settlement or Final Order. The provisions of this section are not intended to restrict payment of any unclassified claims or classified classes of claims which are not disputed.

**Discharge of the Duties of the Trustee**. If the Plan is confirmed pursuant to section 1191(a) of the Bankruptcy Code, the Trustee shall be discharged of his duties as of the Effective Date, except that the United States Trustee may reappoint a trustee as needed for performance of duties under sections 1183(b)(3)(C) and 1185.

If the Plan is confirmed pursuant to section 1191(b) of the Bankruptcy Code, the Trustee shall not be discharged of his duties until after completion by the Reorganized Debtor of all payments due under the Plan, at which point the Trustee shall file a final report and account seeking, *inter alia,* to be discharged of his duties.

## Article 14: LENGTH OF PLAN

Unless otherwise ordered by the Court, all payments due under the Plan shall be made within 36 months of the Effective Date.

## Article 15: TAX CONSEQUENCES OF PLAN

The Plan and the resulting tax consequences may be complex, and the tax consequences of the Plan will depend upon certain factual determinations. No ruling has been or will, before the Effective Date, be requested from the Internal Revenue Service regarding the tax consequences of the Plan. No assets of the Debtor have been sold or transferred since the filing of this case and as a result, no tax consequences as to such assets have arisen since the filing of this case.

**BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES THIS DISCLOSURE STATEMENT RENDERS NO TAX ADVICE ON THE TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO ANY PARTICULAR CREDITOR, TO THE DEBTOR, OR TO INTEREST HOLDERS. EACH PARTY IS URGED TO CONSULT HIS OR HER TAX ADVISOR AS TO THE TAX CONSEQUENCES OF THE PLAN TO HIM OR HER INCLUDING ANY CONSEQUENCES UNDER STATE OR LOCAL TAX LAWS**.

The following constitutes a summary of the potential tax consequences which may arise upon Confirmation of the Plan.

**15.01 Tax Consequences to the Debtor**

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD Income") realized during the taxable year, which generally includes the amount of principal debt discharged and any interest that has been previously accrued and deducted for tax purposes but remains unpaid at the time the indebtedness is discharged. The Tax Code permits a debtor in bankruptcy to exclude its COD Income from gross income but requires the debtor to reduce certain tax attributes by the amount of the excluded COD income. The Debtors will not be required to include COD Income in gross

19

21-61492-tnap    Doc 44    FILED 02/21/22    ENTERED 02/21/22 21:24:17    Page 19 of 20

income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case.

**15.02   Certain U.S. Federal Income Tax Consequences to Holders of Claims and Equity Interests**

The U.S. Federal Income Tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims under a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place. Also, where a gain or loss is recognized by the holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by several factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction for the underlying claim.

Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests to avoid penalties that may be imposed on them under the Internal Revenue Code; (B) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein, and (C) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.

Dated: February 21, 2022                            */s/ David Stanfill*
                                                                    David Stanfill, President